# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 14, 2009          Decided July 17, 2009

No. 08-5156

SOUTHEAST ALABAMA MEDICAL CENTER, ET AL.,
APPELLANTS

v.

KATHLEEN SEBELIUS,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01143)

———

*James F. Segroves* argued the cause for appellants. With him on the briefs was *Malcolm J. Harkins III*.

*Henry C. Whitaker*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Gregory G. Katsas*, Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Mark B. Stern*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  Appellants are 113 inpatient hospitals located in Alabama, Louisiana, and Mississippi.  They contend that the Department of Health and Human Services (HHS) interpreted the Medicare reimbursement statute in a way that improperly deprived them of millions of dollars.  The district court disagreed and granted summary judgment for the Department.  We affirm the district court's judgment in all but one respect.

I

In 1983, Congress revised the Medicare reimbursement statute to move from a "reasonable cost" method of retrospective compensation to the Prospective Payment System (PPS).  Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149; *see Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019, 1021 (D.C. Cir. 2000); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1008-09 (D.C. Cir. 1999).  Under this system, HHS reimburses hospitals that provide inpatient care to eligible beneficiaries according to a preestablished formula, regardless of the actual costs incurred.  42 U.S.C. § 1395ww(d).  The payment rates are tied to the national average cost of treating a patient in a particular "diagnosis-related group" (DRG).  *Id.*  The statute mandates that HHS adjust the standardized payment rates for area differences in hospital costs, *id.* § 1395ww(d)(3)(E), which HHS accomplishes through annual notice-and-comment rulemaking.  This case concerns the methodology that HHS used to make these geographic adjustments in fiscal years (FY) 2003 and 2004.

During those years, the relevant statutory section, 42 U.S.C. § 1395ww(d)(3)(E), provided in relevant part:

> The Secretary shall adjust *the proportion*, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the DRG prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by *a factor* (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level. Not later than October 1, 1990, and October 1, 1993 (and at least every 12 months thereafter), the Secretary shall update *the factor* under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States. Not less often than once every 3 years the Secretary (through such survey or otherwise) shall measure the earnings and paid hours of employment by occupational category and shall exclude data with respect to the wages and wage-related costs incurred in furnishing skilled nursing facility services.

42 U.S.C. § 1395ww(d)(3)(E) (2000) (emphases added).[1] HHS has traditionally referred to the "proportion" described in § 1395ww(d)(3)(E)'s first sentence as the "labor-related share," and has referred to the "factor" described in the first two sentences as the "wage index." Following the district court, we will instead refer to these constructs by their statutory names and will capitalize "Proportion" and "Factor" for purposes of clarity. The measurement of "the earnings and paid hours of employment by occupational category" described in the third

---

[1]Unless otherwise indicated, citations to 42 U.S.C. § 1395ww(d)(3)(E) will refer to the version in effect during FY 2003 and 2004, as codified in the 2000 edition of the U.S. Code.

sentence of § 1395ww(d)(3)(E) has traditionally been known as the "occupational mix," a term we will retain.

Although § 1395ww(d)(3)(E) is hardly a paragon of clarity, the bottom line is as follows: The statute first requires HHS to determine the Proportion of the DRG reimbursement that is attributable to wages and wage-related costs. HHS must then adjust that Proportion by a Factor reflecting the relative hospital wage level in the hospital's geographic area as compared to the national average hospital wage level; the rest of the reimbursement amount -- the share not attributable to wages or wage-related costs -- is not adjusted. In addition, HHS must adjust the Factor itself for occupational mix. *But see infra* Part II.C (explaining that this last requirement is not applicable to the fiscal years at issue on this appeal).

For FY 2003 and 2004, HHS determined the Proportion to be 71.066 percent.[2] The Factor varied significantly across geographic areas, ranging in FY 2004 from a high of 1.51 in the Oakland, California area to a low of 0.42 in northwest Puerto Rico.[3] As the mathematics worked out, hospitals in geographic areas with Factors less than 1 -- i.e., hospitals in low-wage regions -- wanted the Proportion to be as low as possible, whereas hospitals in areas with Factors greater than 1 wanted the Proportion to be as high as possible. In addition, every hospital

---

[2]Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 45,346, 45,468 (2003) [hereinafter FY 2004 Final Rule]; Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates, 67 Fed. Reg. 49,982, 50,042 (2002) [hereinafter FY 2003 Final Rule].

[3]Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates; Correction, 68 Fed. Reg. 57,732, 57,736-43 (2003).

wanted its own area's Factor to be as high as possible. The hospitals bringing this case are all from areas that were assigned Factors less than 1.[4]

The appellant hospitals challenged HHS's final rules for FY 2003 and 2004 before the Department's Provider Reimbursement Review Board, *see* 42 U.S.C. § 1395*oo*(b), which granted their request for expedited judicial review in the United States District Court for the District of Columbia, *see* 42 U.S.C. § 1395*oo*(f)(1). The hospitals raised four main arguments before the district court. First, they contended that during the fiscal years in question, HHS violated § 1395ww(d)(3)(E) by including in the Proportion hospital expenses that were not "attributable to wages and wage-related costs" and that did not vary on a local basis. Second, they

---

[4]The government provides an example to illustrate how reimbursement payments would have been calculated "for treatment in a diagnostic category with a payment level of $10,000":

> The part of that payment attributable to wage-related costs [the Proportion] would be subject to adjustment. For FY 2004, the [Proportion] was approximately 71 percent; accordingly, $7,100 was subject to adjustment. That $7,100 would be multiplied by the relevant [Factor]. In Oakland, where the FY 2004 [Factor] was 1.51, the [Proportion]-related payment would thus be adjusted upward to $10,721[,] with a total payment of $13,621 [i.e., $10,721 plus the non-wage-related share of $2,900, calculated by subtracting $7,100 from $10,000]. In rural Louisiana, where the wage index was .75, the calculation would result in a total payment of $8,225 [i.e., ($7,100 x .75) + $2,900] for the same diagnostic category.

HHS Br. 4 n.1. Hence, as a consequence of the Proportion and Factor, a hospital in Oakland would be reimbursed $5,396 more than a hospital in rural Louisiana for providing the same type of treatment.

argued that the Department's decision to include certain cost items in the Proportion but not in the Factor violated the plain language of the statute and was arbitrary and capricious. Third, they argued that HHS also violated the statute and acted arbitrarily and capriciously by failing to adjust the Factor for occupational mix. Finally, they maintained that HHS violated the statute by failing to account for interstate employment when calculating the Factor.

The district court rejected all of these arguments and granted summary judgment for the government. *Se. Ala. Med. Ctr. v. Leavitt*, 539 F. Supp. 2d 352 (D.D.C. 2008). The court found that HHS's interpretation of "wages and wage-related costs" in the Proportion was consistent with the words' ordinary meaning, *id.* at 357-58; that the statute permitted HHS to use different cost items in the Proportion as compared to the Factor, *id.* at 359; that there was "no basis on [the] record on which to conclude that the Secretary's choice to not collect [data on occupational mix] in time . . . to be applied in [FY 2003 and 2004] was unambiguously forbidden by the statute" or otherwise unreasonable, *id.*; and that the hospitals' failure to raise their interstate employment argument before the Provider Reimbursement Review Board barred them from raising it in court, *id.* at 360.

The hospitals now appeal, making the same four arguments. We address each of them below. We note, however, that although resolution of these arguments has financial significance for the appellants' FY 2003 and 2004 claims, the significance of the arguments for any subsequent-year claims is extremely limited. *See* Oral Arg. Recording at 7:57-8:05 (acknowledgment by counsel for appellants that their primary arguments in this case "do not affect [them] for the future"). The import of the first two arguments was greatly diminished if not negated by a statutory amendment, effective in FY 2005, which directs HHS

to "substitute '62 percent' for the [P]roportion" unless doing so "would result in lower payments to a hospital than would otherwise be made." Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 403(a)(1), 117 Stat. 2066, 2265 (codified at 42 U.S.C. § 1395ww(d)(3)(E)(ii)). And as explained in Part II.C below, appellants' third argument was mooted by statutory amendments to the provision regarding occupational mix.

II

In reviewing HHS's actions on appeal from the district court, this "court addresses the issue *de novo*, without deference to the decision of the district court." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994). We review the Department's interpretation of provisions of the Medicare statute under the two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under that framework, "[i]f the intent of Congress is clear, . . . [a court] must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue," the court must uphold the agency's interpretation as long as it is reasonable. *Id.* at 843. We review other aspects of HHS's actions under the Administrative Procedure Act (APA), pursuant to which we will uphold them unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 42 U.S.C. § 1395*oo*(f)(1).

A

The hospitals' primary target on appeal is the Proportion -- that is, "the proportion . . . of hospitals' costs which are attributable to wages and wage-related costs." 42 U.S.C.

§ 1395ww(d)(3)(E). For the fiscal years in question, HHS interpreted the phrase "costs which are attributable to wages and wage-related costs" to include "wages[,] salaries, [and] fringe benefits," as well as "professional fees, contract labor, postage, business services, and labor-intensive services." FY 2003 Final Rule, 67 Fed. Reg. at 50,041; *see* FY 2004 Final Rule, 68 Fed. Reg. at 45,467-68. "Each of these categories," HHS has said, "is classified as labor-related because it consists of direct payments to labor inputs by the hospital or hospital payments for services that are very labor intensive." Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1991 Rates, 55 Fed. Reg. 35,990, 36,046 (1990) [hereinafter FY 1991 Final Rule]. The hospitals object to three cost items that HHS included in its calculation of the Proportion.

1. First and foremost, the hospitals maintain that HHS should not have included payments made for hospital employees' health insurance, worker's compensation insurance, pension plans, and other fringe benefits because they are not "wages" or "wage-related." But the Medicare statute defines neither "wages" nor "wage-related," and there is nothing unreasonable about HHS's determination that these cost items fit within common definitions. As the district court noted, some dictionaries define the term "wage," itself, to include fringe benefits. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2568 (1976) (defining a "wage" as "a pledge or payment of usually monetary remuneration by an employer especially for labor or services usually according to contract and on an hourly, daily, or piecework basis *and often including* bonuses, commissions, and *amounts paid by the employer for insurance, pension, hospitalization, and other benefits*" (emphases added) (abbreviations in original replaced with whole words)). In any event, fringe benefits -- which are part of the compensation an employee receives for his or her services -- fit comfortably

within the broad meaning of the term "wage-*related*." *See id.* at 1916 (defining "related" as "having relationship: connected by reason of an established or discoverable relation"); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The ordinary meaning of ['relating to'] is a broad one[,] . . . and the words thus express a broad [statutory] purpose."); *Moshea v. NTSB*, No. 08-1218, --- F.3d ---, --- (D.C. Cir. June 30, 2009) ("Without getting into a metaphysical discussion of the meaning of the phrase 'related to,' it suffices here to say that the words 'related to' are broad.").

The hospitals also maintain that HHS wrongly included the cost of payments for insurance premiums, pensions, and other fringe benefits because such costs do not vary based on local labor markets. It is true that the Secretary has found it relevant, in determining whether a cost item is wage-related, to examine whether the item varies with the local labor market. For example, the 2004 final rule stated that "[w]e define the [Proportion] to *include* all costs that are likely related to, influenced by, or vary with local labor markets, even if they could be purchased in a national market." FY 2004 Final Rule, 68 Fed. Reg. at 45,468 (emphasis added). But although HHS's statements on this issue are not crystal clear, we do not read them as declaring that *only* costs that vary with local labor markets may be included in the Proportion.

Nor does the statute itself impose such a requirement. The statute provides only that the Secretary must, first, estimate the Proportion of hospitals' costs "which are attributable to wages and wage-related costs," 42 U.S.C. § 1395ww(d)(3)(E), and, second, adjust that Proportion "for area differences in hospital wage levels by [the] [F]actor," *id.* The geographic element enters at step two -- in the calculation of the Factor -- and not at step one's calculation of the Proportion. As counsel for HHS correctly noted at oral argument, the Proportion and the Factor

are "two different moving parts that work together" to accomplish the purpose of adjusting PPS payments for area wage differences, and the role of the Proportion is to define the "universe" of costs that the Factor adjusts on this basis. Oral Arg. Recording at 21:01-26.

Accordingly, while it might have been reasonable for HHS to restrict the Proportion to cost items that vary on a local basis, it was not unreasonable for the agency to decline to do so. *See Entergy Corp. v. Riverkeeper, Inc*., 129 S. Ct. 1498, 1505 (2009) (holding that an agency's "view governs if it is a reasonable interpretation of the statute -- not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts"). Even if the hospitals are correct that the costs of fringe-benefit items used to calculate the Proportion do not vary with local labor markets -- a proposition that is not obvious and certainly not proven -- it would not establish a violation of the Medicare statute or the APA.

2. The hospitals also contend that the agency erred by including in the Proportion payments to independent contractors for certain nonmedical services. These include the services of landscapers, accountants, and lawyers. In the district court, the hospitals asserted that only amounts "paid directly by the hospital to the individual providing the service to the hospital, whether that individual is an independent contractor or a hospital employee," were appropriately included. *Se. Ala. Med. Ctr.*, 539 F. Supp. 2d at 357. Although this, too, might have been a reasonable line to draw, it is not the only reasonable line. As the district court found, "[t]he statute does not expressly limit the wages and wage-related costs to those paid by the hospital directly to an individual, as opposed to some third-party employer of individuals providing hospital services." *Id.* Rather, the statute simply directs HHS to include costs that are "*attributable to* wages and wage-related costs," 42 U.S.C.

§ 1395ww(d)(3)(E) (emphasis added), and payments to third parties to provide workers reasonably fall within that category. Indeed, when a hospital hires an outside entity to provide individuals to perform services for which it might otherwise have used or hired its own employees, the hospital incurs costs that it would otherwise have spent directly on wages. *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates, 67 Fed. Reg. 31,404, 31,447 (2002) [hereinafter FY 2003 Proposed Rule] ("By capturing more than just the direct labor costs[,] . . . our definition captures the 'buy-versus-hire' decisions hospitals make in the purchase of their inputs.").

On appeal, the hospitals take a somewhat different tack, suggesting that the line should be drawn against including fees paid for "non-health-care-related" or "nonmedical" services, while permitting the inclusion of payments to "non-employee independent contractors such as physicians." Appellants' Br. 20; *see id.* at 22-23, 34-37. Again, this might have been a reasonable line to draw. But the statute merely requires the inclusion of "costs which are attributable to wages and wage-related costs," 42 U.S.C. § 1395ww(d)(3)(E), and HHS did not act unreasonably in interpreting that phrase to include nonmedical costs.[5]

---

[5]The hospitals make three further arguments that also fail to persuade. First, they suggest that HHS's habit of referring to the Proportion as the "labor-related share," rather than the "*wage*-related share," betrays a lack of fidelity to the statutory text. Yet while the term "labor-related share" may be an infelicitous shorthand, it carries no legal force. Second, they cite the Internal Revenue Code for a more restrictive definition of "wages" than the one used by HHS. The tax code, however, is not germane to this unrelated area of law; indeed, the Supreme Court has "pointed out that the word 'wages' has different meanings under different statutes." *United States v. Davis*, 154 F.2d 314, 317 (D.C. Cir. 1946) (citing *Williams v. Jacksonville*

3.  Finally, the hospitals challenge HHS's decision to include postage costs in calculating the Proportion, and with this they strike a heavier blow.  HHS initially proposed to exclude postage from the Proportion in FY 2003, *see* FY 2003 Proposed Rule, 67 Fed. Reg. at 31,447, but ultimately declined to do so in that year and in both of the next two.  In its FY 2006 rulemaking, however, HHS changed its mind, concluding:

> We do not believe that we should continue to include postage costs in the [Proportion] as postage fees are set at nationally uniform rates and are not affected by local purchasing power of hospitals.  The cost of postage is primarily influenced by weight of the package and the distance the package is traveling.

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates, 70 Fed. Reg. 47,278, 47,395-96 (2005) (citation omitted).  The question is whether there was any reasonable ground for including postage costs in the fiscal years under challenge here.

In its FY 2003 and 2004 final rules, HHS gave no reason at all for deciding against its initial proposal to revise the Proportion by excluding postage.[6]  HHS's briefs offer one

---

*Terminal Co.*, 315 U.S. 386 (1942)).  Finally, the hospitals claim that HHS's definition of the Proportion is inconsistent with its own cost-reporting worksheet.  *See* Addendum to HHS Br. at 56 (reproducing the worksheet).  The worksheet, however, is not inconsistent with the agency's definition.  *See, e.g.*, *id.* at line 9 (directing hospitals to report fees paid to certain independent contractors as "Other Wages & Related Costs").

[6]The HHS brief states that the Secretary "decided not to make that *and other* revisions to the [Proportion] because he was concerned that the proposed revisions resulted in a net *increase* in the

somewhat opaque rationale, citing the Department's 1990 statement that it includes "very labor-intensive" services in the Proportion. FY 1991 Final Rule, 55 Fed. Reg. at 36,046 (quoted in HHS Br. at 26). Yet even assuming that postage (or mail delivery) is very labor-intensive, HHS does not argue that postage is materially more labor-intensive than other excluded services or explain why postage was included while other very labor-intensive services were not. *Cf.* Oral Arg. Recording at 30:38-59 (acknowledgment by HHS that "we have no position on what kind of detailed analysis might support [the determination] that postage is or is not labor-intensive").

It cannot be the case that *every* service purchased by a hospital that is very labor-intensive is therefore "attributable to" the *hospital's* "wages and wage-related costs." 42 U.S.C. § 1395ww(d)(3)(E). Although much labor surely goes into the manufacture of ambulances, HHS does not contend that the entire purchase price of an ambulance can be counted toward the Proportion. HHS must explain why the cost of the stamps on a hospital's letters is wage-related while the cost of the ambulance in its garage or the grapes in its cafeteria is not. "Until the Secretary provides such an explanation," this court "cannot evaluate whether the Secretary's interpretation of the statute is reasonable within the meaning of *Chevron* step two." *Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78, 88 (D.C. Cir. 1998).

In the previous section, we concluded that HHS reasonably classified payments to certain independent contractors as "wages

---

[Proportion], which would have harmed rural hospitals like plaintiffs." HHS Br. 25-26 (citing FY 2003 Final Rule, 67 Fed. Reg. at 50,042 (first emphasis added)). But neither the brief nor the final rules suggest that excluding postage alone would have had that harmful result (and no doubt it would not have), or that there was any need to tie postage to the other proposed revisions.

or wage-related" where the contractors provided workers whom the hospital might otherwise have hired directly. Such payments, the Department reasonably explained, "capture[] the 'buy-versus-hire' decisions hospitals make in the purchase of their inputs." FY 2003 Proposed Rule, 67 Fed. Reg. at 31,447. But that rationale cannot justify including postage costs as wages or wage-related, as there is no realistic possibility that a hospital would hire its own employees to deliver any significant fraction of its mail.

HHS does point out that it has counted postage costs toward the Proportion since the PPS system was first established. But that is history, not explanation. No matter how consistent its past practice, an agency must still explain why that practice comports with the governing statute and reasoned decisionmaking. Although it does motivate us to give the agency another chance to provide an adequate explanation, no amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one. *Cf. Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740 (1996) ("To be sure, agency interpretations that are of long standing come before us with a certain credential of reasonableness, since it is rare that error would long persist. But neither antiquity nor contemporaneity with the statute is a condition of validity.").

In sum, although HHS has reasonably explained why two of the three cost categories that appellants challenge come within the statutory Proportion, it has failed to provide such an explanation for postage. We therefore remand this issue for HHS to provide an adequate explanation, if it can. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).[7]

---

[7]At oral argument, HHS contended for the first time that the hospitals' postage argument was waived because they did not raise it

B

The hospitals' next contention is that HHS's decision to include certain contract labor cost items in the Proportion, but not in the Factor, conflicts with the Medicare statute and the APA. The hospitals reject the explanation that HHS provided in its rulemaking: although the agency possessed adequate data to include nonmedical professional fees and certain other labor-intensive services in the Proportion, it lacked adequate data to include them in the Factor. *See* FY 2004 Final Rule, 68 Fed. Reg. at 45,399; FY 2003 Final Rule, 67 Fed. Reg. at 50,022-23. If the data were not good enough for the Factor, the hospitals contend, then they cannot have been good enough for the Proportion.

The hospitals' argument overlooks the textual and functional differences between the Proportion and the Factor. Whereas the statute provides that the Proportion shall be "estimated by the Secretary," it states that the Factor shall be updated "on the basis of a survey conducted by the Secretary." 42 U.S.C. § 1395ww(d)(3)(E). Whereas the Proportion need only be estimated "from time to time," the Factor must be updated "at least every 12 months." *Id.* And whereas the Proportion measures "hospitals' costs which are attributable to

---

with the agency at the appropriate time. This contention is itself waived because HHS did not raise it with this court at the appropriate time. *See Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003) (holding that points raised for the first time at oral argument are waived); *Belton v. Washington Metro. Area Transit Auth.*, 20 F.3d 1197, 1202 (D.C. Cir. 1994) (holding that a party may waive its own waiver argument by not raising it in a timely fashion on appeal). In any event, the hospitals did raise the argument before the agency. *See* Appellants' Additional Excerpts from the Administrative Record 269a-70a, 418a.

wages and wage-related costs," Congress intended the Factor to "reflect[] the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." *Id.* The statute thus makes clear that the Proportion and the Factor are not identical constructs. Accordingly, the Secretary has some discretion to construct them in non-identical ways.

A point of particular significance is that an "estimate[]" is not the same thing as a determination based on a "survey." To estimate the national total costs of any category of hospital expenditure for the Proportion, HHS only had to possess sufficiently valid and reliable aggregate data -- from whatever source -- on which to base its figures. For this purpose, HHS found, statistics developed by outside entities like the Department of Commerce were appropriate. By contrast, the statute limits the Factor to expenditures that can be measured "on the basis of a survey" that reflects relative hospital wage levels by geographic area. For that purpose, HHS collected wage-and-hour information from hospitals. Those surveys asked for data on wages and hours of hospital employees and of contractors that provided direct patient-care services. But HHS did not believe that hospitals could reliably report the wages and hours associated with other contractors that provided services that affected patient care indirectly, often at off-site facilities. *See, e.g.*, Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1997 Rates, 61 Fed. Reg. 46,166, 46,182 (1996).

The hospitals do not challenge HHS's assessment of these collection difficulties, nor do they explain why the data HHS relied upon for the Proportion were deficient for its purpose. Even if it would have been preferable for the Department to use identical cost items in the Proportion and the Factor, we cannot say that the limited deviations it permitted were unreasonable.

*Cf. Methodist Hosp. of Sacramento*, 38 F.3d at 1230 ("The statute does not specify how the Secretary should construct the [Factor], nor how often she must revise it, although these methodological issues both bear significantly on the accuracy of the Secretary's adjustments. Rather, Congress through its silence delegated these decisions to the Secretary.").

C

The hospitals' third contention is that HHS violated the Medicare statute by failing to adjust the Factor to account for occupational mix, notwithstanding "Congress's unambiguous instruction that he do so unless it was not 'feasible.'" Appellants' Br. 14. This claim fails because the congressional instruction cited by the hospitals did not apply to the fiscal years at issue in this case.

For many years, § 1395ww(d)(3)(E) provided that the survey on which the Factor is based "shall measure" occupational mix "[t]o the extent determined feasible by the Secretary." *See, e.g.*, 42 U.S.C. § 1395ww(d)(3)(E) (1994). It is undisputed that, until 2004, HHS had never taken such measurements. On December 21, 2000, however, Congress repealed this discretionary language and replaced it with the following new language: "Not less often than once every three years the Secretary (through such survey or otherwise) shall measure" data on occupational mix. Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, Pub. L. No. 106-554 App. F, § 304(c), 114 Stat. 2763A-463, 2763A-495 (codified in part at 42 U.S.C. § 1395ww(d)(3)(E)). An uncodified provision of that legislation further instructed the Secretary to "first complete" the collection and measurement of occupational mix data "[b]y not later than September 30, 2003, for application beginning October 1, 2004" -- that is, for

application beginning in FY 2005.  *Id.* § 304(c)(3), 114 Stat. at 2763A-495.

The consequence of these amendments was that, by the end of the 2000 calendar year, § 1395ww(d)(3)(E) no longer required the Secretary to measure data on occupational mix if he determined it was feasible -- just that he do so in time for application in FY 2005.  In short, for the fiscal years relevant to this case (2003 and 2004), § 1395ww(d)(3)(E) gave the Secretary a pass with respect to occupational mix.  The Medicare statute therefore provides no support for the hospitals' claim.

Recognizing the obstacle that the 2000 amendments pose for their argument, the hospitals cite the general savings statute, 1 U.S.C. § 109,[8] for the proposition that Congress's "subsequent . . . imposition of a firm deadline to fix a problem that the Secretary had created and continued for years" -- the failure to adjust the Factor for occupational mix -- "does not absolve the Secretary of liability for his past misconduct."  Appellants' Br. 55.  The hospitals' reliance on § 109 is misplaced.  Even if HHS's longstanding failure to measure data regarding occupational mix constituted a violation of the prior version of § 1395ww(d)(3)(E) -- a point we need not decide -- § 109 would

---

[8]Section 109, entitled "Repeal of statutes as affecting existing liabilities," states in pertinent part:

> The repeal of any statute shall not have the effect to release or extinguish any . . . liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such . . . liability.

1 U.S.C. § 109.

at most suggest that the 2000 amendments did not "release or extinguish any . . . liability incurred under" that prior version. 1 U.S.C. § 109.  But the hospitals do not claim that they are owed anything on account of liabilities incurred by HHS prior to December 2000.  Their claim is that HHS violated § 1395ww(d)(3)(E) by failing to adjust the Factor for occupational mix *in FY 2003 and 2004*.  And that is a claim as to which both the pre-amendment Medicare provision and the savings statute are irrelevant.

D

Finally, the hospitals allege that HHS impermissibly failed to account for interstate employment, particularly "nurse migration," in calculating the Factor.  The inputs to the Factor, they note, "do not take into account the fact that hospitals in neighboring . . . areas often compete with each other for the same employee pool."  Appellants' Br. 56.  As a consequence, HHS "established reimbursement rates that are too low to permit hospitals in low-[Factor] states . . . to effectively compete for employees with neighboring states that have higher [Factors]."  *Id.*  This, the hospitals maintain, violates the statutory command that the Factor "reflect[] the relative hospital wage level in *the geographic area of the hospital* compared to the national average hospital wage level."  42 U.S.C. § 1395ww(d)(3)(E) (emphasis added).

The government contends that we should not reach this claim because the hospitals failed to raise it before the Provider Reimbursement Review Board.  The hospitals insist that they did raise it.  Although the record is not entirely clear, it contains at least one submission that in our view did raise the nurse migration argument specifically with respect to FY 2004.  *See* Supp. J.A. 110a.

In any event, the argument fails on its merits. Section 1395ww(d)(3)(E) provides only that the Factor should "reflect[] the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E). As the Second Circuit has found, "the statute leaves considerable ambiguity as to the term 'geographic area,' which, based only on the literal language of the provision, could be as large as a several-state region or as small as a city block." *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 175 (2d Cir. 2006). As that court further found, HHS's longstanding policy of using Metropolitan Statistical Areas (MSAs) -- which can be interstate -- to define those "geographic areas" is a reasonable response to this ambiguity. *Id.* at 167, 175-78. If it was reasonable for HHS to define "geographic area" in the Factor by reference to the MSA classifications, it was likewise reasonable for the agency to decline to complicate matters by layering in a dynamic model of migratory and commuting patterns. The statute does not define "geographic area," much less require HHS to take into account the movement of workers across such areas.

The hospitals do not seriously dispute any of this, nor suggest any mechanism by which HHS could have measured inter-area effects, nor explain why such an effort would have led to a sounder result. Whether or not it would have been desirable for the Department to adjust the Factor on the basis of inter-area employment, it was reasonable for it to decline to do so.

III

For the foregoing reasons, we affirm the judgment of the district court in part, reversing solely with respect to HHS's decision to include postage costs in the Proportion. We remand the case to the district court with instructions to remand it to

HHS for further consideration on that issue consistent with this opinion.

*So ordered.*