**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KAWEAH DELTA HEALTH CARE DISTRICT, DBA Kaweah Delta Medical Center; ANTELOPE VALLEY HEALTHCARE DISTRICT, DBA Antelope Valley Hospital; COUNTY OF SAN BERNARDINO; HEART HOSPITAL OF BK, LLC, DBA Bakersfield Heart Hospital; BEVERLY COMMUNITY HOSPITAL ASSOCIATION, DBA Beverly Hospital; CASA COLINA HOSPITAL AND CENTERS FOR HEALTHCARE, DBA Casa Colina Hospital; CHINESE HOSPITAL ASSOCIATION, DBA Chinese Hospital; CMCM, INC., DBA College Hospital Costa Mesa; CHLB, LLC, DBA College Medical Center; COMMUNITY MEMORIAL HEALTH SYSTEM, DBA Community Memorial Hospital San Buenaventura; COMMUNITY HOSPITAL OF THE MONTEREY PENINSULA; COUNTY OF CONTRA COSTA, DBA Contra Costa Regional Medical Center; DAMERON HOSPITAL | Nos. 23-55157 23-55209 <br><br> D.C. No. 2:20-cv-06564-CBM-SP <br><br> OPINION |

ASSOCIATION, DBA Dameron Hospital; EISENHOWER MEDICAL CENTER; EL CAMINO HOSPITAL; CITY OF EL CENTRO, DBA El Centro Regional Medical Center; ENLOE MEDICAL CENTER; GOOD SAMARITAN HOSPITAL, a California Limited Partnership; SAN BENITO HEALTH CARE DISTRICT, DBA Hazel Hawkins Memorial Hospital; HENRY MAYO NEWHALL MEMORIAL HOSPITAL, DBA Henry Mayo Newhall Hospital; CHA HOLLYWOOD MEDICAL CENTER, L.P., DBA Hollywood Presbyterian Medical Center; PASADENA HOSPITAL ASSOCIATION, LTN, DBA Huntington Hospital, AKA Huntington Memorial Hospital; KERN COUNTY HOSPITAL AUTHORITY, DBA Kern Medical Center; LOMPOC VALLEY MEDICAL CENTER; AMERICAN HOSPITAL MANAGEMENT CORPORATION, DBA Mad River Community Hospital; MADERA COMMUNITY HOSPITAL; MARIN GENERAL HOSPITAL, DBA MarinHealth Medical Center; MARSHALL MEDICAL CENTER; MARTIN LUTHER KING JR.- LOS ANGELES

MLK-LA HEALTHCARE CORPORATION, DBA Martin Luther King, Jr. Community Hospital; METHODIST HOSPITAL OF SOUTHERN CALIFORNIA; DEANCO HEALTHCARE, LLC, DBA Mission Community Hospital; COUNTY OF MONTEREY, DBA Natividad Medical Center; NORTHBAY HEALTHCARE GROUP, DBA Northbay Medical Center; OAK VALLEY HOSPITAL DISTRICT; OROVILLE HOSPITAL; PACIFICA OF THE VALLEY CORPORATION, DBA Pacifica Hospital of the Valley; PIONEERS MEMORIAL HEALTHCARE DISTRICT; POMONA VALLEY HOSPITAL MEDICAL CENTER; REDLANDS COMMUNITY HOSPITAL; COUNTY OF RIVERSIDE, AKA Riverside County Regional Medical Center, DBA Riverside University Health Systems - Medical Center; SALINAS VALLEY MEMORIAL HEALTH CARE SYSTEM, DBA Salinas Valley Memorial Hospital; SAN ANTONIO REGIONAL HOSPITAL, INC., DBA San Antonio Regional Hospital; SAN GORGONIO MEMORIAL HEALTHCARE DISTRICT, DBA San Gorgonio Memorial Hospital;

COUNTY OF SAN MATEO, DBA
San Mateo Medical Center; COUNTY
OF SANTA CLARA, DBA O'Connor
Hospital, DBA Santa Clara Valley
Medical Center, DBA St. Louise
Regional Hospital; SIERRA VIEW
LOCAL HEALTH CARE DISTRICT,
DBA Sierra View Local Health Care
District; SOMONA VALLEY
HEALTH CARE DISTRICT, DBA
Somona Valley Hospital; SAINT
AGNES MEDICAL CENTER; TRI-
CITY HOSPITAL DISTRICT, DBA
Tri-City Medical Center; VALLEY
PRESBYTERIAN HOSPITAL;
WASHINGTON TOWNSHIP
HEALTH CARE DISTRICT, DBA
Washington Hospital;
WATSONVILLE HOSPITAL
CORPORATION, DBA Watsonville
Community Hospital; COUNTY OF
VENTURA, doing business as
Ventura County Medical Center,

*Plaintiffs-Appellees /*
*Cross-Appellants*,

v.

XAVIER BECERRA, United States
Department of Health and Human
Services, in his official capacity,

> *Defendant-Appellant /*
> *Cross-Appellee.*

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted February 16, 2024
Pasadena, California

Filed December 11, 2024

Before:  Danny J. Boggs,[*] Jacqueline H. Nguyen, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Lee;
Dissent by Judge Nguyen

## SUMMARY[**]

### Medicare

The panel affirmed the district court's holding that the Secretary of Health and Human Services (HHS) lacked the authority to implement its low-wage-index policy—which boosted the wage index, and thus the Medicare

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

reimbursement rate, for lower-wage hospitals—and vacated the district court's decision to remand the case back to the agency without vacating the policy.

Medicare reimburses hospitals based on a standardized rate for medical services, except that the rate must be adjusted for regional wage differences. Congress directed HHS to establish a "wage index" that reflects area wage differences and to adjust Medicare payment rates accordingly. In 2020, HHS adjusted the wage index by inflating the Medicare payment rates for the lowest quartile of hospitals, and paid for it by reducing payments to all hospitals by a small percentage.

The parties agreed that this court had jurisdiction to hear HHS's appeal, which challenged the district court's order holding that the agency lacked authority to issue the low-wage-index policy. The panel held that it also had jurisdiction over the hospitals' cross-appeal challenging the district court's decision to remand without vacatur because appellate jurisdiction extends to the district court's entire decision.

The panel held that the Secretary lacked statutory authority to manipulate the wage-index values for lower-wage hospitals to advance the policy objective of recruiting and retaining medical staff in lower-income communities. The low-wage-index policy violates the plain language of the Wage Index Provision. In addition, the Exceptions and Adjustments Provision cannot independently authorize the low wage index policy. An artificially inflated wage-index for lower-wage hospitals does not "reflect" regional wage differences, as required by the statute. Neither the Secretary's good intentions nor

pressing policy problems can substitute for an agency's lack of statutory authority to act.

The panel vacated the district court's decision to remand the case back to the agency without vacating the policy itself because when an agency cannot issue the challenged policy in another way, the only appropriate remedy is vacatur.

Judge Nguyen dissented because the low wage index policy is fully consistent with the statutory text. The court should not toss out the Secretary's plausible interpretation, and the majority's unnecessary rejection of the Secretary's policy will have drastic repercussions for vulnerable communities.

---

## COUNSEL

Lloyd A. Bookman (argued), Hooper Lundy & Bookman PC, Los Angeles, California; David J. Vernon and Rachel L. Zacharias, Hooper Lundy & Bookman PC, Washington, D.C.; for Plaintiffs-Appellees.

David L. Peters (argued) and Abby C. Wright, Attorneys, Appellate Staff, Civil Division; Brian M. Boynton, Principal Deputy Assistant Attorney General; Garrett F. Mannchen, Attorney, United States Department of Health and Human Services; Susan M. Lyons, Deputy Associate General Counsel; Janice L. Hoffman, Associate General Counsel; Samuel R. Bagenstos, General Counsel; United States Department of Justice, Washington, D.C.; for Defendant-Appellant.

**OPINION**

LEE, Circuit Judge:

Medicare reimburses hospitals based on a standardized rate for medical services—except that the rate must be adjusted for regional wage differences.  Not surprisingly, hospitals' labor costs—*e.g.*, salaries for doctors, nurses, and other staff—can vary among geographic regions.  Congress thus directed the Secretary of the U.S. Department of Health and Human Services (HHS) to establish a "wage index" that "reflects" area wage differences and to adjust the Medicare payment rates accordingly.  So a hospital in a higher wage area receives a higher reimbursement rate for its services than one in a lower wage area.

In 2020, the Secretary tinkered with the wage index by inflating the Medicare payment rates for the lowest quartile of hospitals—and paid for it by reducing payments to all the hospitals by a small percentage.  The Secretary believed that boosting the wage index (and thus the payment rate) for lower-wage hospitals would help them recruit and retain medical staff in lower-income, and often rural, communities. But the Secretary lacks statutory authority to manipulate the wage-index values for lower-wage hospitals to advance this policy objective.  Simply put, an artificially inflated wage index for lower-wage hospitals does not "reflect" regional wage differences, as required under the statute.  While the Secretary may have had a laudable goal in tilting the wage index in favor of the lower-wage hospitals, Congress did not empower him to do so.  And under our system of separation of powers, neither good intentions nor pressing policy problems can substitute for an agency's lack of statutory authority to act.

We thus affirm the district court's holding that the Secretary exceeded his statutory authority in establishing the 2020 wage index. But we vacate the district court's decision to remand the case back to the agency without vacating the policy itself. When an agency cannot issue the challenged policy in another way, the only appropriate remedy is vacatur.

## BACKGROUND

### A. The Medicare System's Prospective Payment System

Congress charged HHS with administering Medicare, a sprawling federal health-insurance program for seniors and younger people with certain disabilities. *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1157 (D.C. Cir. 2015). As one can imagine, this is not a simple task. This case is about only "Part A" of Medicare, which covers a person's "inpatient" care (the care that a person receives at a hospital or in a skilled nursing facility). *Parts of Medicare*, Medicare.gov, available at https://www.medicare.gov/basics/get-started-with-medicare/medicare-basics/parts-of-medicare.

Medicare originally paid hospitals the "reasonable costs" of providing care. *Anna Jacques*, 797 F.3d at 1157. Congress eventually realized that the reasonable-cost framework lacked adequate incentives for hospitals to operate efficiently. So, in 1983, Congress enacted the Prospective Payment System as the main method of paying for care. *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 914 (D.C. Cir. 2009).

The goal of the Prospective Payment System is simple: "reform the financial incentives hospitals face and promote

efficiency in the provision of services." *Anna Jacques*, 797 F.3d at 1158 (cleaned up). Under the new system, a hospital's payments are tied to the national average cost of treating a patient in a particular "diagnosis-related group" (DRG) according to a preestablished formula, regardless of the actual costs incurred by the hospital in treating that patient. 42 U.S.C. § 1395ww(d). Put in simple terms, the agency sets a flat sum for a particular medical service based in part on the national average cost, and then pays hospitals that amount for the service.

But Congress also recognized that the average cost of treating a patient varies across the country because hospitals in more expensive areas typically have higher wage-related costs. *See Anna Jacques*, 797 F.3d at 1157–58. For example, a hospital in northern Virginia likely pays higher salaries to doctors, nurses, and other staff than a hospital in a small town in West Virginia does. To account for these cost disparities, the statute requires HHS to calculate a "wage index" that compares hospital wages within defined geographic areas to a national average and to adjust Medicare payments accordingly. *Id.* at 1158; § 1395ww(d)(3)(E)(i). Thus, hospitals in high-wage areas receive larger payments than those in low-wage areas. An area with a wage level equal to the national average wage has a wage-index value of one; lower-wage areas have a value of less than one; and higher-wage areas have a value of greater than one. *Anna Jacques*, 797 F.3d at 1159.

## B. The Wage Index Provision and the Exceptions and Adjustments Provision

There are two relevant Medicare statutory provisions at issue that we will describe as the "Wage Index Provision" and the "Exceptions and Adjustments Provision."

1.  The Wage Index Provision

The Wage Index Provision directs the Secretary how to calculate the wage index each year:

> [T]he Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the DRG [Diagnosis-Related Group] prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level. Not later than October 1, 1990, and October 1, 1993 (and at least every 12 months thereafter), the Secretary shall update the factor under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States.

42 U.S.C. § 1395ww(d)(3)(E)(i). HHS creates the wage index through annual notice-and-comment rulemaking. *Southeast Alabama*, 572 F.3d at 914. All adjustments to the wage index must be budget neutral, meaning that if some hospitals get a bump upward in the reimbursement rate, then other hospitals must have their rates reduced to pay for it. 42 U.S.C. § 1395ww(d)(3)(E)(i).

Although § 1395ww(d)(3)(E) is "hardly a paragon of clarity, the bottom line is as follows: The statute first

requires HHS to determine the Proportion of the DRG reimbursement that is attributable to wages and wage-related costs." *Southeast Alabama*, 572 F.3d at 915. Then, HHS must "adjust that Proportion by a Factor reflecting the relative hospital wage level in the hospital's geographic area as compared to the national average hospital wage level." *Id.* In other words, the agency must first isolate the wage cost portion of the Medicare reimbursement, and then adjust that amount based on the area's hospital-wage level compared to the national level.

To adjust the Medicare payment rate based on regional wage differences, HHS first conducts an annual survey of hospitals' wages and wage-related costs. It compiles wage data from cost reports submitted by hospitals and uses that data as the basis for the wage index. But because of the time it takes to collect, verify, and analyze the data, HHS typically uses three-year-old data to create the wage index. This data lag means that increases in an area's relative wages will not be reflected in that area's wage-index factor until four years later.

2. The Exceptions and Adjustments Provision.

This provision allows the Secretary to provide "by regulation for such other exceptions and adjustments to such payment amounts under this subsection as the Secretary deems appropriate." 42 U.S.C. § 1395ww(d)(5)(I)(i). Courts have blessed the use of this section to make relatively minor changes to payment amounts. *See, e.g.*, *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 259–60 (D.D.C. 2015) (collecting cases showing adjustments are acceptable so long as they are minor enough to be fairly characterized as only "adjustments"). The provision,

however, "does not give the Secretary carte blanche to override the rest of the Act."  *Id.*

## C.  The 2020 Wage Index

In 2020, HHS proposed its "low wage index policy." The policy adjusts the lowest quartile of wage index values upward to the point halfway between their actual value and the 25th percentile value.  To take HHS's example:

> If the wage index value for a given hospital would be 0.6663, and the 25th percentile wage index value for FY 2020 is 0.8482, then half the difference between the otherwise applicable wage index value and the 25th percentile wage index value is 0.0910 (that is, (0.8482 - 0.6663)/2).  Under the proposal, the wage index value for the hospital would then be .7573 (that is, 0.6663 + 0.0910).

In this example, the low wage index policy would essentially boost a hospital's wage-related payment by about 13.6% (that is, 0.0910/0.6663).  But the policy always maintains the rank order of wage-index values—meaning that a hospital with a higher wage level will always receive a larger payment than a hospital with a lower wage level.

HHS maintains that the low-wage-index policy is necessary to address "growing disparities between low and high wage index hospitals."  These disparities, according to HHS, were purportedly caused by the wage index's data lag, which "create[d] barriers to hospitals with low wage index values from being able to increase employee compensation." In real-life terms, hospitals in low-wage areas face headwinds recruiting and retaining medical staff because

they must compete with hospitals in higher wage regions that offer more lucrative compensation, according to HHS. And the agency crafted the low-wage-index policy to combat this problem.

To maintain budget neutrality after bumping up the reimbursement rate for the low-wage hospitals, HHS reduced payments to all hospitals by 0.2016%. Plaintiffs—a group of 53 California hospitals—allege that their Medicare payments were reduced by around $3.8 million.

## D.  Procedural History

Plaintiffs administratively challenged HHS's authority to implement the low-wage-index policy, particularly its budget-neutrality adjustment that led to lower payment rates. After the Provider Reimbursement Review Board granted expedited judicial review, the hospitals sued in district court under the Administrative Procedure Act, alleging (among other things) that the low-wage-index policy: (1) violates the relevant statutory provisions; (2) is arbitrary and capricious; (3) results from a faulty administrative procedure, and (4) is unsupported by evidence in the record. HHS responded that the low-wage-index policy is independently authorized by either the Wage Index Provision or the Exceptions and Adjustments Provision.

The district court denied HHS's motion for summary judgment, granted the hospitals' motion for summary judgment, and remanded the matter to the Secretary "for further proceedings consistent with [its] Order." The court held that HHS lacked authority to implement the low-wage-index policy under either the Wage Index Provision or the Exceptions and Adjustments Provision. It also held that the policy was procedurally defective to the extent that HHS

rested its policy on the Exceptions and Adjustments Provision.

Despite these fundamental issues, the district court declined to vacate the low-wage-index policy because "vacatur . . . creates a serious risk of disruption to the Medicare Prospective Payment System and operation of hospitals." HHS timely appealed, and the hospitals timely cross-appealed.

## DISCUSSION

### A. We have jurisdiction over the hospitals' cross-appeal.

Although both parties agree that this court has jurisdiction to hear HHS's appeal under 28 U.S.C. § 1291, they dispute whether we have appellate jurisdiction to review the hospitals' cross-appeal challenging the district court's decision to remand without vacatur.

We agree that HHS can appeal the district court's order holding that the agency lacked authority to issue the low-wage-index policy. That order is final and immediately appealable because "agencies compelled to refashion their own rules face the unique prospect of being deprived of review altogether." *Alsea Valley All. v. Dep't of Com.*, 358 F.3d 1181, 1184 (9th Cir. 2004); *see also Crow Indian Tribe v. United States*, 965 F.3d 662, 675–76 (9th Cir. 2020) (applying *Alsea Valley*); *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 789 (9th Cir. 2003) (reviewing a district court's order finding that the agency exceeded its authority under the Medicare statute and remanding for further proceedings).

We also have jurisdiction over the hospitals' cross-appeal because our jurisdiction extends to the district court's

entire decision. We have held that if "both the plaintiff and the relevant agency" seek "review of the district court's remand order," the order is final for both parties' appeals. *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1076 (9th Cir. 2010) (citing *City of Santa Clara v. Andrus*, 572 F.2d 660, 663 (9th Cir. 1978)); *see also NAACP v. U.S. Sugar Corp.*, 84 F.3d 1432, 1436 (D.C. Cir. 1996) ("[W]hat matters for the purposes of our appellate jurisdiction is whether the district court's decision—and not any particular party challenging it—is properly before us, which it is as a result of the [Agency's] appeal."); *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1012 (D.C. Cir. 1999) (explaining that the appellate court had "jurisdiction to review the Secretary's appeal [of a remand order] under § 1291" and therefore "may also consider the Hospitals' cross-appeal"). That is the case here.

## B. The low-wage-index policy violates the plain language of the Wage Index Provision.

To defend its 2020 low-wage-index policy, HHS relies on an argument that agencies often invoke to justify their exercise of expansive power: "discretion." The agency claims that the statute gives it "discretion in determining the nature and extent to which the wage index must approximate relative regional wage differences."

But HHS is not relying on its discretion; rather, it is exercising authority beyond what Congress gave it. Nowhere does the Wage Index Provision empower HHS to manipulate the wage index so that the index no longer reflects area differences in wage levels.

1.  The low-wage-index policy does not "reflect" area differences in hospital wage levels.

The Wage Index Provision requires that HHS adjust the wage index "by a factor (established by the Secretary) *reflecting* the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level."     42 U.S.C. § 1395ww(d)(3)(E)(i) (emphasis added).   The central issue is this: What does "reflect" require of HHS, and how flexible is this statutory command?   Does "reflect," as HHS argues, permit the agency to manipulate the wage index so long as the index roughly resembles the real world by maintaining the rank order of the hospitals?   Or does "reflect" require that the wage index hew more closely to real-world wage levels?

We review de novo a district court's statutory interpretation, *Fournier v. Sebelius*, 718 F.3d 1110, 1117–18 (9th Cir. 2013) (citation omitted), and generally interpret statutory terms according to "their ordinary, everyday meanings."     Scalia and Garner, *Reading Law: The Interpretation of Legal Texts* at 69 (2012) (describing the ordinary-meaning rule as "the most fundamental semantic rule of interpretation").   To "reflect" ordinarily means "to give back or exhibit as an image, likeness, or outline," to "mirror."   *Reflect*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/reflect.     In other words, a reasonable person would ordinarily understand "reflect" to mean closely representing an image, data, or other item.   For example, when someone says, "our backyard pool budget reflects the costs of supply and labor," we understand that budget to include those two items—and not, say, swim safety lessons, as important as they may be.

HHS's low-wage-index policy—and its resulting payment increase for the bottom quartile hospitals—does not "reflect" area differences in hospital-wage levels. Rather, the manipulated index reflects HHS's policy goal—however well-intentioned it may be—of helping hospitals in low-wage areas increase their ability to retain and recruit employees. The very nature of that boost in payment reflects something other than the regional wage differences.

Consider this analogy: No one would say that a grocery receipt "reflects" the price of groceries if the store gives, say, a 13.6% discount to shoppers in the lowest quartile by income. Some may believe that it perhaps constitutes good public policy but the manipulated prices in that receipt do not "reflect" real-life grocery prices. Quite the opposite—they deliberately deviate from real-life prices. Here, too, we cannot say that an artificial bump in payment to the low-wage hospitals "reflects" regional hospital-wage differences. Indeed, both the purpose and effect of HHS's low-wage index-policy are to deviate from—and not reflect—the actual wage-level differences.

HHS contends that it ensured the wage index reflected real-world wage levels by maintaining the rank order of hospital areas. But merely maintaining the rank order of hospital wage-levels does not satisfy the statutory provision's requirement that the wage index "reflect" area differences in hospital-wage levels. A simple example clarifies why the meaning of "reflect" is not so pliable. Say there are three hospitals: Hospital A pays an average wage of $50,000 a year; Hospital B pays $100,000 a year; and Hospital C pays $150,000 per year. The average of these three hospitals' wages is $100,000, and their simplified wage-index values would thus be: 0.5 for Hospital A, 1 for Hospital B, and 1.5 for Hospital C. HHS contends that,

under the Wage Index Provision, HHS could—for redistributive reasons—inflate Hospital A's wage index value to .99 and reduce Hospital C's wage index value to 1.01. This would maintain the rank order of the hospitals because Hospital A still receives less money than Hospital B, which, in turn, receives less than Hospital C. But such a distorted index hardly "reflects" the real differences in the wage levels among the hospitals.

To be sure, HHS correctly notes that the Wage Index Provision does not require mathematical exactitude—and we do not read "reflect" to mean the same as "equal," contrary to the dissent's suggestion. Dissent at 35. For example, HHS can enforce deadlines for data collection even though those deadlines may lead to a wage index based on imperfect data. *See Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 93 (D.C. Cir. 2020) (HHS may "balance accuracy against finality and efficiency."). It can also make minor technical changes to reflect more accurate data or enhance the index's administrability. *See, e.g.*, *Anna Jacques Hosp. v. Sebelius*, 583 F.3d 1, 5–6 (D.C. Cir. 2009) (permitting HHS to remove data from its survey that is incomplete, inaccurate, or otherwise aberrant); *Anna Jacques*, 797 F.3d at 1157 (permitting HHS to change the geographic areas used to calculate the wage index and to treat multi-campus hospitals as if they only had one main campus).

In sum, a reasonable and ordinary understanding of the statutory term "reflect" does not require exact numerical precision, but it cannot be so elastic as to smuggle in a costly policy goal not authorized by the statutory provision—no matter how worthwhile that goal may be. Going back to our grocery analogy, a shopper who agrees to round up to the nearest dollar will still likely say that the receipt "reflects" the true cost of groceries (*e.g.*, a grocery bill of $79.80 being

rounded up to $80).  But as noted earlier, a reasonable person would not believe a receipt "reflects" the true price of groceries if a shopper receives a substantial discount to promote the policy of making groceries more affordable for some people.

We thus hold that the Wage Index Provision requires that the wage index "reflect" HHS's best estimate of the relative wage levels of hospitals across the country—free from other policy goals that distort, rather than reflect, the regional wage differences.  The Secretary here stretched and twisted the plain meaning of the statutory text to pursue a policy objective not permitted under the statute.  Congress, not the agency, has the power to bless the use of a wage index to seek the laudable goal of helping lower-wage hospitals recruit and retain medical staff.  And to fix this policy problem, Congress must do its job—we cannot let an agency seize power it does not have.  *See* THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961) ("[T]he preservation of liberty requires that the three great departments of power should be separate and distinct."); *cf.* James Kerr, *How Bill Belichick's 'Do Your Job' Mantra Applies to Leadership*, INC., Jan. 26, 2015, https://www.inc.com/james-kerr/how-do-your-job-can-be-a-difference-maker-for-your-company.html (last visited Dec. 2, 2024).

2. HHS's selective adjustment of the wage index does not reflect a predictive judgment of regional wage differences.

Perhaps recognizing that its policy-driven justification for its 2020 wage index is unmoored from the statutory text, HHS offers an argument more rooted in the statutory goal of considering regional wage differences: It argues that the pay

bump was necessary because it has "discretionary authority . . . to make predictive judgments regarding whether historic data adequately captures current and future regional wage disparities."  As noted earlier, it takes HHS three years to collect, verify, and analyze data for creating the wage index. HHS thus claims that the wage index is essentially outdated (by four years) and that it was using its "predictive judgment" to calculate a more accurate wage index that in fact reflects current regional hospital-wage differences.

Even if the Wage Index Provision were to permit such predictive judgments, the low-wage-index policy does not calculate a more accurate or reflective wage index.  As HHS admits, the data lag by definition affects *all* hospitals, not just the bottom-quartile hospitals, because the wage index is based on historical data for all hospitals.  The data lag thus harms any hospital that raises wages because that hospital's wage-index factor is based on years-old data.  And on the flip side, the data lag helps any hospital that recently decreased its wages because that decrease is also not contemporaneously reflected in its Medicare payments.  Yet HHS's low-wage-index policy selectively corrects the data lag for only 25% of hospitals, undermining its claim that it is exercising its predictive judgment of regional wage differences.  Thus, this preferential adjustment of the data lag for only some hospitals does not "reflect" nationwide area differences in hospital-wage levels, as mandated by the statute.

3.   The wage index must be calculated uniformly.

Lastly, HHS's argument violates the statutory requirement of a single wage index that applies to all hospitals and betrays an equal-treatment principle inherent in the text of the statute. *See Atrium Med. Ctr. v. U.S. Dep't*

*of Health & Hum. Servs.*, 766 F.3d 560, 569 (6th Cir. 2014). Congress consistently used "the singular—'the proportion' and 'a factor'—indicat[ing] that the wage index must be uniformly determined and applied." *Id.* (citing *Sarasota Mem'l Hosp. v. Shalala*, 60 F.3d 1507, 1513 (11th Cir. 1995)). HHS thus must create a "uniform picture" of wage levels and a "uniform index" to calculate hospitals' payments. *Sarasota Memorial*, 60 F.3d at 1513. For example, if HHS classifies a certain compensation as a "fringe benefit" and thus excludes it from the wage index for one hospital, then HHS must do the same for all hospitals. *Id*.

The Wage Index Provision thus requires that HHS establish "the" national average hospital-wage level and use that average as the baseline from which to create the wage index. *See Bridgeport Hosp. v. Becerra*, 589 F. Supp. 3d 1, 11 (D.D.C. 2022). The provision's use of the phrase "'*the* relative hospital wage level'" further "indicates that Congress intended that there would be a single wage index— determined on the basis of data gleaned from a survey" that applies to all hospitals. *Id*. (quoting 42 U.S.C. § 1395ww(d)(H)).

Here, HHS calculated the uniform wage index and then manipulated that calculation for the bottom 25% of hospitals only. This manipulation effectively creates two separate wage indexes: one index for the bottom quartile of hospitals and another for everyone else. As the D.C. Circuit recognized in a parallel challenge to the low-wage-index policy, such distortion—besides violating the statute's requirement that the wage index reflect area wage differences—violates the statutory requirement of a single wage index. *See Bridgeport Hosp. v. Becerra*, No. 22-5249, 2024 WL 3504407, at *3–4 (D.C. Cir. July 23, 2024).

## C.  The Exceptions and Adjustments Provision cannot authorize the low wage index policy.

HHS alternatively argues that the Exceptions and Adjustment Provision independently authorizes the low-wage-index policy.  That provision states: "The Secretary shall provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection as the Secretary deems appropriate."      42 U.S.C. § 1395ww(d)(5)(I)(i).   Relying on this provision, HHS maintains that the Secretary found it "appropriate" to "adjust" the Medicare payment rate for the bottom quartile hospitals.

HHS's argument founders on both statutory-construction and separation-of-power grounds.

First, under a well-established canon of statutory construction, specific statutory provisions control general ones.  *See Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) ("This court has understood the present canon ('the specific governs the general') as a warning against applying a general provision when doing so would undermine limitations created by a more specific provision.").  This is especially the case "when the two [provisions] are interrelated and closely positioned."  *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam).

The broadly worded Exceptions and Adjustment Provision cannot swallow up the more specific Wage Index Provision.  The Wage Index Provision specifically addresses how to calculate the wage index, and (as discussed above) it does not permit HHS to promulgate the low-wage-index policy.  § 1395ww(d)(3)(E)(i).  HHS thus cannot rely on the more general Exceptions and Adjustments Provision— which does not set out in any detail the boundaries of the

Secretary's authority—to undermine the specific requirements of the Wage Index Provision. *See UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 700 (9th Cir. 2018) (quoting *Varity Corp.*, 516 U.S. at 519). We thus agree with the D.C. Circuit that HHS may not use the Exceptions and Adjustments Provision to sweep aside the "detailed reimbursement scheme" that Congress set out in the exceptionally detailed Medicare statute. *Bridgeport Hosp.*, 2024 WL 3504407, at *6.

Second, HHS's reading of the statutory provision would conflict with the nondelegation doctrine if the Secretary could make adjustments and exceptions based on an amorphous "as appropriate" standard. A "statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). Although the standard is "not demanding," *United States v. Melgar-Diaz*, 2 F.4th 1263, 1267 (9th Cir. 2021), it is not meaningless either. When Congress has "failed to articulate *any* policy or standard to confine discretion," the delegation of authority is unconstitutional. *Gundy*, 588 U.S. at 146 (cleaned up).

HHS's interpretation of the Exceptions and Adjustments Provision lacks an intelligible principle. The provision merely requires that the Secretary do what he or she "deems appropriate." 42 U.S.C. § 1395ww(d)(5)(I)(i). To "deem" something is to "to have an opinion." The statute essentially tells the Secretary to do whatever he or she thinks is right, which does not provide an intelligible principle delineating the scope of the statutory discretion. *Cf. Gundy*, 588 U.S. at 146 (allowing delegations of authority that instruct the

agency to regulate in the "public interest" and "to protect the public health").

Such an amorphous standard—basically, do what you think is right—does not amount to a proper delegation of power. Rather, when interpreted as HHS does, it represents an abdication of responsibility by Congress and tantamount to a blank check to the executive branch. *See Gundy*, 588 U.S. at 169 (Gorsuch, J., dissenting) (failing to uphold the separation of powers "would serve only to accelerate the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties."). Although we recognize that the Secretary was, in good faith, addressing a pressing problem here, such unrestricted power may be abused in the future—and that is why we enforce the limitations imposed by our system of separation of powers. As James Madison warned, "It may be a reflection on human nature" that separation-of-powers is "necessary to control the abuses of government." THE FEDERALIST NO. 51, at 319 (Clinton Rossiter ed., 1961). Indeed, we do not even need to rely on the wisdom of the Framers to understand this point—we know this intuitively: In our personal lives, we would hesitate to give a blank checkbook to even a trusted friend with no guidance or limits (and, if we do, we may regret it later).

The Exceptions and Adjustments Provision thus cannot authorize the low-wage-index policy.[1]

---

[1] Because we determine that Section 1395ww(d)(5)(I)(i) does not authorize the low-wage-index policy, we need not decide whether the Secretary promulgated the low-wage-index policy "by regulation."

**D. The district court erred in not vacating the low-wage-index policy.**

The district court remanded this matter to HHS for further proceedings without vacating the low-wage-index policy. The district court reasoned that "while the Secretary committed serious error by adopting the Low Wage Index policy which exceeded his authority under the Medicare Act in violation of the APA, vacatur of the policy creates a serious risk of disruption to the Medicare Prospective Payment System and operation of hospitals." But because HHS has not argued that it could re-issue the low-wage-index policy through any other means, remand without vacatur is inappropriate.

Section 706(2) of the APA states that if a reviewing court finds that an agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" then the court "*shall* . . . hold unlawful and set aside" that agency action. 5 U.S.C. § 706(2)(C) (emphasis added). We, and other courts, permit remand without vacatur only in "limited circumstances." *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted); *see also Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). In such cases, the district court must weigh the seriousness of the agency's errors against the disruptive impact of an interim change. *Pollinator Stewardship*, 806 F.3d at 532 (citation omitted). For example, we sometimes remand without vacatur where the agency committed procedural error in its notice-and-comment rulemaking, allowing the agency to correct the issue and then (re)enact the same policy.

But to remand without vacatur, we must first find that the agency can correct the error on remand. *See North Carolina*

*v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (concluding that the EPA's rule "must" be vacated because "fundamental flaws" prevented the EPA from promulgating the same rule on remand).  Here, HHS cannot correct its error on remand because the agency lacks statutory authority to promulgate the low-wage-index policy.  *See Bridgeport Hosp.*, 2024 WL 3504407, at *7 (holding that the low-wage-index policy must be vacated).  We thus vacate the district court's decision to remand without vacatur.

## CONCLUSION

We affirm in part, vacate in part, and remand to the district court for further proceedings consistent with this opinion.

---

NGUYEN, Circuit Judge, dissenting:

Just because in this *Loper Bright* new world we are free to ignore an agency's statutory interpretation doesn't mean that we should.[1]  To address the longstanding budgetary struggles of rural hospitals, the Secretary of Health and Human Services ("HHS") adjusted the intricate formula for calculating hospital reimbursements based on his reasonable reading of the Medicare statute.  The majority, despite lacking the agency's expertise in implementing this complex statute, jettisons HHS's carefully designed policy based on its own doubtful interpretation.  Because the majority improperly constrains the agency's ability to address a serious structural problem, with dire consequences for the

---

[1] *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("[C]ourts . . . may not defer to an agency interpretation of the law simply because a statute is ambiguous.").

rural communities that will lose access to health care, I respectfully dissent.

## I.

## A.

The Medicare program reimburses hospitals for the costs of providing inpatient healthcare services to Medicare beneficiaries. *See* 42 U.S.C. § 1395ww(d). To incentivize hospitals to provide efficient levels of service, Medicare pays them a fixed rate per diagnosis for treating each covered patient, "regardless of the hospital's actual costs." *Becerra v. Empire Health Found. ex rel. Valley Hosp. Med. Ctr.*, 597 U.S. 424, 429 (2022) (citing 42 U.S.C. § 1395ww(d)(1)–(4)). In theory, the rates "reflect the amounts an efficiently run hospital, in the same region, would expend to treat a patient with the same diagnosis." *Id.* In practice, however, the system for many years has perpetuated and exacerbated disparities between hospitals based on regional labor costs. *See* Medicare Hospital Inpatient Prospective Payment Systems Proposed Policy Changes and Fiscal Year 2020 Rates ("2020 Proposed Rule"), 84 Fed. Reg. 19158, 19162 (proposed May 3, 2019).

The root of these disparities lies in the methodology for calculating reimbursement rates. The Secretary sets rates prospectively before each fiscal year. *See* 42 U.S.C. § 1395ww(d)(3). As a starting point, the Secretary takes the "standardized amount," which is essentially hospitals' average nationwide treatment cost for each discharged patient, calculated in a base year and updated annually for inflation. *See id.* § 1395ww(b)(3)(B)(i), (d)(2), (d)(3)(A)(iv)(II); *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). To ensure that hospitals are not penalized for their patient mix, the standardized amount is

weighted by the relative cost of treating a particular diagnosis.  *See* 42 U.S.C. § 1395ww(d)(4).

At issue here, the standardized amount is also adjusted to account for regional variations in the cost of labor.  *See id.* § 1395ww(d)(3)(E)(i).      This   adjustment   has   two components.  Because the standardized amount comprises both labor and nonlabor costs, the Secretary must first determine "the proportion . . . of hospitals' costs which are attributable to wages and wage-related costs."  *Id.*  The Secretary then adjusts this proportion for hospitals in each region pursuant to a wage index of relative labor costs.  *See id.*

The wage index adjustment to the standardized amount must be budget neutral—*i.e.*, "made in a manner that assures that the aggregate payments . . . in the fiscal year are not greater or less than those that would have been made in the year without such adjustment."  *Id.*   Thus, when some hospitals receive more than the standardized amount because of their region's relatively high labor costs, other hospitals must receive less.

The wage index calculation is just the starting point in adjusting   reimbursement   amounts   based   on   wage differentials and other localized concerns.  In recognition of the complex factors driving healthcare costs, Congress provided for various regional- and hospital-specific rate adjustments.  *See, e.g.*, 42 U.S.C. § 1395ww(d)(3)(E)(ii)– (iv); *see also Empire Health Found.*, 597 U.S. at 429. Congress further directed the Secretary to "provide by regulation for such other exceptions and adjustments to such payment amounts . . . as the Secretary deems appropriate." *Id.* § 1395ww(d)(5)(I)(i).   Collectively, these exceptions distort the wage index.  *See* Medicare Payment Advisory

Commission ("MedPAC"), *Report to the Congress: Promoting Greater Efficiency in Medicine* 131 (June 15, 2007), https://perma.cc/LD32-ZFWN.

**B.**

While the Secretary calculates the wage index prospectively, the data driving the calculation is dated. The Secretary conducts an annual survey of hospitals' wages and wage-related costs, *see id.* § 1395ww(d)(3)(E)(i), but it takes HHS three years or more to collect, verify, and analyze this data for use in the wage index. *See, e.g.*, 2020 Final Rule, 84 Fed. Reg. at 42304 (using data from October 2015 through September 2016 for the 2020 wage index update); *see also* Medicare Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48916, 49049 (Aug. 11, 2004) (explaining that "hospitals' wage data are always 3 to 4 years old" because of the time needed for hospitals to complete and submit cost reports; fiscal intermediaries to perform a detailed review of the data and submit it to the agency; and the agency to compile a complete set of wage data from a common fiscal year period).

The lag between data collection and wage index calculation (the "data lag") impedes hospitals in low wage areas from increasing employee compensation because they must wait several years for their additional costs to translate into a higher reimbursement rate. *See* 2020 Proposed Rule, 84 Fed. Reg. at 19394–95. Hospitals in higher wage areas, "by virtue of higher Medicare payments," can afford to pay wages that maintain or improve their area's high wage index value notwithstanding that they are also affected by the data lag. *Id.* Over time, this has led to "growing disparities between low and high wage index hospitals, including rural

hospitals that may be in financial distress and facing potential closure."[2]  *Id.* at 19395.

The data lag is exacerbated by the "condition of circularity" that results from the Secretary's exclusive reliance on hospital cost reports to calculate regional wage differences.  *Id.* at 19394.  When a hospital successfully restrains wage increases relative to the national average, its wage index value decreases.  MedPAC, *supra*, at 130.  The lower wage index value leads to lower reimbursement amounts, creating even more pressure to reduce costs.  *Id.*; *see* 2020 Proposed Rule, 84 Fed. Reg. at 19394.

To address this "systemic issue," the Secretary proposed a "low wage index policy" that, beginning in 2020, would adjust the lowest quartile of wage index values upward to the point halfway between their normally calculated value and the 25th percentile value.  2020 Proposed Rule, 84 Fed. Reg. at 19395.  In other words, the policy would boost the lowest wage index values while preserving the rank order of all wage index values.  It thus "would provide certain low wage index hospitals with an opportunity to increase employee compensation without the usual lag in those increases being reflected in the calculation of the wage index."  *Id.*

---

[2] The majority rejects the agency's factual findings and asserts, based on no evidence, that the data lag does not affect low wage hospitals disproportionately simply because it "affects *all* hospitals."  Maj. Op. at 21.  But we are bound by an agency's well-supported factual findings on a matter within the scope of its expertise. *See G.C. v. Garland*, 109 F.4th 1230, 1239 (9th Cir. 2024) ("The court reviews the agency's fact-finding 'under the highly deferential substantial evidence standard,' which treats an agency's findings of fact as conclusive unless 'any reasonable adjudicator would be compelled to conclude to the contrary.'" (quoting *Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1016 (9th Cir. 2023))).

The Secretary envisioned that the policy would last at least four years "to allow employee compensation increases implemented by [low wage] hospitals sufficient time to be reflected in the wage index calculation." *Id.* at 19395. He "intend[ed] to revisit the issue of the duration of the policy in future rulemaking" after gaining experience. *Id.* The Secretary anticipated that "there may be no need for the continuation of the policy" after the "increased employee compensation is reflected in the wage data" because he "expect[ed] the resulting increases in the wage index" values to persist. 2020 Final Rule, 84 Fed. Reg. at 42328.

Ultimately, the Secretary adopted the low wage index policy with one change. *See id.* at 42332. To maintain budget neutrality, the Secretary had proposed making a downward adjustment to the top quartile of wage index values. *See* 2020 Proposed Rule, 84 Fed. Reg. at 19396. Instead, the Secretary imposed "a budget neutrality adjustment to the national standardized amount for all hospitals." 2020 Final Rule, 84 Fed. Reg. at 42332. In 2020, this budget neutrality adjustment decreased the standardized amount by just 0.2%. *See id.* at 42338.

## II.

### A.

Subject to exceptions not at issue here, the wage index provision directs that:

> the Secretary shall adjust the [wage-related portion of the standardized amount] for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic

> area of the hospital compared to the national
> average hospital wage level.

42 U.S.C. § 1395ww(d)(3)(E)(i).   In other words, the Secretary must establish "a factor" for each geographic area, and it must reflect the area's wage ratio—the area's relative wage level vis-à-vis the national average.

As the Secretary points out, this language "affords [him] discretion in determining the nature and extent to which the wage index must approximate relative regional wage differences."   It is replete with words that suggest a relationship between—but not necessarily identity of—a hospital's wage index factor and its wage ratio.

The critical word, as majority recognizes, is "reflecting." To "reflect" ordinarily means "to give back or exhibit as an image, likeness, or outline," *i.e.*, to "mirror."  *Reflect*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reflect        [https://perma.cc/89PV-6K3E] (last updated Jan. 16, 2024).  But the image, likeness, or outline need not recreate the original in its exact proportions; the quintessential element of "reflect" is ordinal—not proportional—replication.[3]

---

[3] For example, both mirrors and maps "reflect" their source material despite sometimes compressing certain data points more than others. The convexity in a car's passenger-side rearview mirror increases the driver's field of vision—thus, "Objects in Mirror Are Closer Than They Appear," 49 C.F.R. § 571.111(S5.4.2)—and the image can be distorted by up to 12.5%, *see id.* § 571.111(S5.4.1).  A map of former U.S. Route 66 may narrow from south to north, depending on the projection, but regardless of its precise shape, the map will always reflect that the highway "winds from Chicago to LA" through St. Louis, Joplin, Oklahoma City, Amarillo, Gallup, Flagstaff, Winona, Kingman,

The Secretary expressly designed the low wage index policy to preserve hospitals' rank order, which was a "critical aspect" of the policy. 2020 Final Rule, 84 Fed. Reg. at 42327. In adopting the final rule, the Secretary rejected alternative proposals, such as a wage index floor or a policy applicable to all hospitals that met specified criteria, that would have disrupted the rank order. *See id.* at 42326, 42327. The Secretary found that "the rank order generally reflects meaningful distinctions between the employee compensation costs faced by hospitals in different geographic areas." *Id.* at 42326.

Other words in the wage index provision similarly suggest imprecision. While the word "relative" could mean "expressed as the ratio of the specified quantity . . . to the mean of all the quantities involved," *Relative*, Merriam-Webster Dictionary, https://www.merriam-webster.com/ dictionary/relative [https:// perma.cc/F7SY-GGFZ] (last updated Jan. 19, 2024), that would render it superfluous to "compared to." The ratio would be the same if it were "the . . . hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." For "relative" to do any work, it must mean that a region's wage index factor is "not [an] absolute" reflection of the ratio that follows, *id.*, but one that preserves its order among the ratios of other regions.

The indefinite article "a" before "factor" likewise suggests discretion. If Congress had intended a specific wage index value for each region, it would have directed the Secretary to apply "the" factor reflecting the area's comparative wage level. *See McFadden v. United States*,

---

Barstow, and San Bernardino—in that order. The King Cole Trio, (Get Your Kicks On) Route 66 (Capitol Records 1946).

576 U.S. 186, 191 (2015) ("When used as an indefinite article, 'a' means '[s]ome undetermined or unspecified particular.'" (quoting *A*, *Webster's New International Dictionary* 1 (2d ed. 1954))); *see also United States v. Merrell*, 37 F.4th 571, 578 (9th Cir. 2022) (Boggs, J., dissenting) ("The use of the indefinite article in 'a sentence' indicates a non-specific, rather than a particular, sentence.").

Lastly, if the Secretary had no discretion when setting the wage index values, it was odd for Congress to parenthetically specify that the adjustment be by a factor "established by the Secretary."  If Congress intended the Secretary to mechanically apply a formula, there would be no need for the Secretary to "establish" anything.[4]

## B.

The majority reads the wage index provision as if Congress had used the phrase "equal to" rather than "reflecting."  But Congress was surely aware of the semantical difference.  After all, some form of the word

---

[4] "[L]egislative history confirms that Congress intended to grant the Secretary exceptionally broad discretion to determine the wage index— the relevant conference report simply stated that '[n]o particular methodology for developing the indices is specified.'" *Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 560, 568 (6th Cir. 2014) (quoting H.R. Rep. No. 100-495, at 521 (1987) (Conf. Rep.)). When adding the wage index provision, *see* Social Security Amendments of 1983, Pub. L. No. 98-21, § 601(e), 97 Stat. 65, 156, Congress stated only that "the Secretary would adjust the part of the payment which reflects wage and wage-related costs to reflect differences between those costs in the area of the hospital and those costs in hospitals in the United States generally."  H.R. Rep. No. 98-25, at 153–54 (1983).  Congress later added a wage survey requirement. *See* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4004(a), 101 Stat. 1330, 1330-47.

"equal" appears in § 1395ww no less than 148 times. *See, e.g.*, 42 U.S.C. § 1395ww(d)(5)(B)(ii) ("For purposes of clause (i)(II), the indirect teaching adjustment factor is equal to $c^x(((1+r)$ to the nth power)-1), where 'r' is the ratio of the hospital's full-time equivalent interns and residents to beds and 'n' equals .405. Subject to clause (ix), for discharges occurring . . . on or after October 1, 2007, 'c' is equal to 1.35."). When Congress demanded precision, it used "equal."

Congress used the word "reflect" in other parts of the statute as well, but those instances only confirm that Congress used the word to convey discretion. *See, e.g.*, 42 U.S.C. § 1395ww(d)(4)(A)–(C)(i) ("The Secretary shall establish a classification of inpatient hospital discharges by diagnosis-related groups and a methodology for classifying specific hospital discharges within these groups. For each such diagnosis-related group the Secretary shall assign an appropriate weighting factor which reflects the relative hospital resources used with respect to discharges classified within that group compared to discharges classified within other groups. The Secretary shall adjust the classifications and weighting factors . . . to reflect changes in treatment patterns, technology . . . , and other factors which may change the relative use of hospital resources.").

Congress used "equal to" and "reflecting" differently, and it did so throughout the statute. The Secretary's understanding of "reflecting" is consistent with this distinction. *See Bare v. Barr*, 975 F.3d 952, 968 (9th Cir. 2020) ("It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." (quoting *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003))).

The majority acknowledges that the wage index provision "does not require mathematical exactitude," Maj. Op. at 19, and suggests that the wage index need only "hew more closely to real-world wage levels" to survive scrutiny, *id.* at 17. Yet by holding that the Secretary must use his "best estimate of the relative wage levels of hospitals across the country" without "distort[ion]," *id.* at 20, the majority precludes the Secretary from establishing any factor other than the precise regional wage ratio.[5]

In addition, the majority erroneously faults the 2020 wage index for not being "uniformly determined and applied." *Id.* at 22 (quoting *Atrium Med. Ctr.*, 766 F.3d at 569). This confuses the need for uniform application of the rules—which equal protection plainly requires—with a need for uniform rules. "The Equal Protection Clause does not forbid classifications," *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1140 (9th Cir. 2011) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)), and it permits the government to treat individuals differently

---

[5] Even if the majority opinion could be read to allow for some discretion, the majority provides the Secretary no guidance on its exercise. If some distortion is allowed, then how much is too much? Take the majority's three-hospital example with relative wage ratios of 0.5, 1.0, and 1.5. The majority posits that compressing these values 98% of the way to the average wage (to values of 0.99, 1.00, and 1.01) would be too much distortion, *see* Maj. Op. at 18–19, but the Secretary did nothing so dramatic. What about—more analogous to the actual policy—a 12% compression (to values of 0.56, 1.00, and 1.44)? The majority opines that a grocer's policy of "round[ing] up to the nearest dollar" would accurately reflect "the true cost of groceries," *id.* at 19, but if items cost $0.50, $1.00, and $1.50, the grocer will charge $1 for the first two and $2 for the third—far more distortion than in the three-hospital example. The majority forces the Secretary to guess from these inconsistent results how much distortion, if any, would be tolerated.

according to economic need so long as the policy is "extended to all who are similarly situated." *W.C. Peacock & Co. v. Pratt*, 121 F. 772, 777 (9th Cir. 1903).

The Secretary did not apply the rules in an arbitrary way; he promulgated the low wage index policy to address a specific problem as part of the overall methodology for calculating the wage index, and he "utilized that rule consistently and evenhandedly for all hospitals," *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1172 (D.C. Cir. 2015). While only a quarter of the hospitals benefitted from it, the policy was designed to address a problem that affected any similarly situated hospital. *Cf. id.* at 1162–63, 1172–73 (upholding wage index policy designed to address issue affecting three hospitals nationwide and impacting only hospitals in the Boston-Quincy region). If a hospital successfully raises wages to the extent that it no longer falls into the lowest wage quartile in a subsequent year, it would stop benefitting from the policy, and the hospital replacing it in the lowest quartile would see its wage index factor boosted. There is no evidence that the Secretary was targeting specific hospitals for special benefits—as opposed to any hospital that meets specific criteria.

## III.

Although the Secretary's policy goals are irrelevant to the statutory analysis, *see Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019), they highlight why, in close cases, courts should not dismiss an agency's reasonable interpretation of the statute it administers. "[A]lthough an agency's interpretation of a statute 'cannot bind a court,' it may be especially informative 'to the extent it rests on factual premises within the agency's expertise.'" *Loper Bright*, 144 S. Ct. at 2267 (cleaned up) (quoting *Bureau of*

*Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)).  In the Secretary's decades of experience administering the wage index provision, he has observed it wreak havoc on rural hospitals.

Prior to 2020, "wage index policies create[d] barriers to hospitals with low wage index values from being able to increase employee compensation."  2020 Final Rule, 84 Fed. Reg. at 42326.  Many of these hospitals struggled to stay solvent.  More than a third of those in the lowest quartile of wage index values had negative profit margins in 2016, the most recent year for which data was available at the time. *See* HHS Off. of Inspector Gen., Data Brief No. A-01-20-00502, The Centers for Medicare & Medicaid Services Could Improve Its Wage Index Adjustment for Hospitals in Areas with the Lowest Wages 11 (Dec. 2020), https://perma.cc/5T3S-C6SK.  As a result of this financial stress, 129 rural hospitals closed between 2010 and 2020. *See* Univ. of N.C. Cecil G. Sheps Ctr. for Health Servs. Rsch., *Rural Hospital Closures*, https://www.shepscenter.unc.edu/programs-projects/rural-health/rural-hospital-closures [https://perma.cc/N5HE-DT24] (last visited Nov. 17, 2024).  By requiring the Secretary to return to these failed policies, the majority ensures that rural communities will continue to lose access to health care.

The low wage index policy is fully consistent with the statutory text, whereas the majority interprets "reflecting" to have an unnaturally restrictive meaning.  But even if the majority's reading were plausible, we should not toss out the agency's equally plausible interpretation.  Because the majority's unnecessary rejection of the Secretary's policy will have drastic repercussions for vulnerable communities, I dissent.